**ORIGINAL**

2007 JUL 24  PM 4: 02
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
FILED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

James L. Martin, plaintiff      : Civil Action No. 85-00053-JJF

       v.               : Jury Trial Demanded

Delaware Law School of Widener University, Inc., Commonwealth of Pennsylvania Department of Transportation, Bureau of Traffic Safety Operations, et. al., defendants

Plaintiff's Memorandum of Law in Support of Motion to Reopen

### ALLEGATIONS OF FACTS

I, James L. Martin, certify the following statements to be true to the best of my knowledge and information this 24th day of July 2007, and further certify that they are made under oath in accord with 28 USC Sec. 1746:

1. On 5-24-07, I asked for the renewal of my driver's license at the Delaware Division of Motor Vehicles.

2. After I passed the eye examination, a clerk asked me to sign a statement to acknowledge that my license had been revoked in Pennsylvania.

3. I responded that I had no adverse driving history, and that the interference with my license occurred over twenty-five (25) years ago. Despite my statements about having a good driving record ever since I was licensed, in May 1969, the clerk proceeded to issue a preprinted disclosure that indicated my license had been revoked. When he asked me to sign it, I first

defendants continued to pursue this matter as though it were not pending in any court, even though the filing of a notice of appeal served as a supersedeas and as a stay to any and all attempts to carry out any lift orders until 30 days after final disposition of the appeal. The defendants claim that they "were not aware that a Notice of Appeal had been filed . . .," although the record clearly shows they were properly and repeatedly served. They filed no pleadings, briefs, or other documents in the litigation I had to pursue to have their continuing interference my license restored. The original file was removed from the Lancaster County Court of Common Pleas; therefore, the Notice of Appeal lingered for over 2 years, while I awaited processing on documents never transmitted from the Lancaster Court of Common Pleas to the Superior Court in Philadelphia.

8. On 9-24-81, Trooper Nicksic came to my home in Quarryville, PA; he left a written notice directing me to find someone who would drive me to the police station. This was admitted at 32a. On Friday evening, 3-26-82, PennDOT sent a police officer to my home area. He parked a marked policecar next to my neighbor's house to await my return and, when I did not arrive, Nicksic just continued to wait there until nearly mid-night, while I was working for an accounting client. This was admitted at 12a to 13a.

9. Police officers and agents acting on behalf of PennDOT called and communicated with members of my family, with school officials, and with my neighbors in a bad-faith effort to harass me without legitimate cause, and this prying into my personal life was not privileged.

3

10. The defendants admitted, at RFA 24, "At no time did you grant me the opportunity for a hearing before revoking my license." See 4a for request, at No. 24; see 10a for "Admitted," at No. 24.

11. I never concealed my whereabouts or withheld any evidence available to me incident to this matter.

12. I have had a good driving record ever since I was first licensed to drive in May 1969, as the defendants admitted in RFA 27. See 10a.

13. The defendants efforts to apprehend me caused concern at the Law School I was attending in Delaware. Marvin Mercer, one of my professors, called me from class on 10-2-81 and said he got an emergency message for me. He gave me the note from the School's receptionist, which appears in the related case.

14. My "permanent" license was restored within 24 hours after I filed my brief in the PA Superior Court at 02308 PHL 83. The defendants were aware of the facts and laws recited in my brief for the preceding 2 1/2 years, but nonetheless continued to deprive me of the most basic adversarial and procedural rights an accused person is supposed to have.

15. They never did have any medical reports from a doctor or from any medical personnel about any medical impairment they alleged I had. RFA 29, at 11a.

16. The defendants did nothing to alleviate the effects of the unauthorized and improper revocation and suspension even after my

4

permanent license was restored on 12-1-83. RFA 34, at 12a. The defendants claimed that there was no reason for them to take any restorative measures.

17. Because the defendants continued their scheme despite a properly and timely filed Notice of Appeal, I filed an "Application for Stay Pending Action on Petition for Review under Pa. R. A. P. 1781(a)," on 11-12-81, in the Lancaster County Court of Common Pleas. Only four (4) days later, in an "Official Notice" dated 11-16-81, John Pachuta indicated that the revocation dated 11-16-81 was in addition to any previously issued suspension/revocation, and "credit toward serving said suspension will begin when license is received by Bureau." Pachuta admitted "that the language referred to is the standard language found in a letter notifying of suspension." RFA 36, at 12a.

18. Defendants did know that they had no legally cognizable reason to revoke or to suspend my driver's license. The Petition for Review, filed in the Lancaster County Court of Common Pleas, was properly served on counsel for the defendants, so they did know that the Petition stayed all further attempts to seize my drivers license. I also filed a supersedeas in addition to the Petition for Review.

19. The defendants did not honor the procedural protections afforded by the Petition for Review, the Supersedeas, or the Stay at any time. RFA 40.

20. The defendants admitted they "did nothing to alleviate the effects of the revocations and suspensions even after my permanent license was restored on 12-1-83." They "admitted that the Department and its employees

5

took no action after restoring plaintiff's driver's license," and "denied that there was any reason for doing so." RFA 41, at 34a.

21. On 9-24-81, Officer Nicksic came to my home at RD 4, Box 434, Quarryville, PA, 19766, in southern Lancaster county, PA, and left a written note that directed me to find someone who would drive me to the police station. See RFA 42.

22. On Friday evening, 3-26-82, Nicksic participated in an attempt to get physical custody over me by awaiting my return to my Quarryville home until almost mid-night. See RFA 43.

23. The phone conversations I had with Nicksic and with the other officers like Wilson were most likely tape-recorded and are in the police records, although the defendants refuse to provide copies of them, or to summarize what they say.

24. In March 1981, Officer Wilson visited my neighbors, like Verna Shirk and Sylvia May, and specifically asked them whether they could say where I was. On 11-25-81, Wilson called me at my apartment in Claymont, Delaware, and read a statement threatening further criminal prosecution if I did not send my driver's license back. On 12-22-81, Wilson called me in Delaware and again threatened further prosecution, including but not limited to sending more policemen out to get custody of me; at this time, Wilson's sergeant, believed to have been Nicksic, also talked with me in a highly abusive and threatening manner. Wilson committed himself to come to

6

Delaware to take my license if I did not "voluntarily" return it, but he did not actually come to DE.

25. On 8-17-83, an attorney in Lancaster notified me that the Prothonotary never transmitted any record, despite the Notice of Appeal I had filed to bring the case before the Superior Court in Phila. The "Petition *nunc pro tunc* to Authorize Transmission of Record on Appeal" is reproduced at No. 88-2300. I served the Petition and proposed Order on PennDOT by mail on 8-22-83. On 8-23-83, Judge Eckman granted the petition "upon receipt of said papers from Petitioner." I restored the record from the stamped copies of the documents sent back to me as evidence of the filing of the originals.

26. Within the next month, the Superior Court issued a "Notice of Appeal Docketing," which showed the case as a criminal one, PA v. Martin, with Harold Cramer serving as counsel for the state. The disposition date, 6-11-81, was correctly shown to be one day before the appeal was filed in the Lancaster Court of Common Pleas, which was 6-12-81. (Ordinarily, a court rules upon an appeal after it is filed rather than before it is filed. However, in several cases I have been involved in, a disposition occurred before the case was even filed, incredible as that seems.) The lower court record was due from the Prothonotary on 7-22-81. The clerk filed it over two (2) years late.

27. To expedite the process, I filed for admittance into the accelerated docket program, but my request was denied on 6-7-84. Judges McEwen, Tamilia, and Hoffman, with the Superior Court in Philadelphia, dismissed

7

the appeal on 7-13-84, claiming that my "operating privileges were reinstated during the pendency of this appeal." The defendants did not appear at the oral argument. No sanctions were imposed against them for this scam, but the judges did suggest that administrative proceedings be initiated before the Office for Civil Rights. I filed a complaint there within the prescribed time, in 1985, but no final decision and authorization to sue was issued until 3-16-88.

28. The 9-12-85 Office for Civil Rights interview notes of John Landis disclose that McFarland and Landis, both on the faculty of Delaware Law School at that time, said, "Martin claimed that the police were following him. This all seemed a bit extreme (strange, paranoid) to us."

29. Additional factual material appears in answers to my first set of interrogatories. Despite the terms of the 11-16-83 revocation notice, they conceded "there was no medical doctor involved."

30. A hand-written letter from admitted felon Ernest Preate, who was the Attorney General of Pennsylvania when the related cases were pending there, was written to me while he was in the federal penitentiary, at 15a to 16a. He claims to have no knowledge of any of the cases from those years, even though his name appears on the opposition briefs filed in various federal courts. As noted, no opposition was filed in state courts. The political cartoons at 17a and 18a provide insights into the Supreme Court of Pennsylvania's failures as well.

31. The statement of Michael J. Dalto, at 19a to 20a, is significant for several reasons, including his attesting the history of factual issues in this case

8

as comprising the longest court case in world history, advanced by the same individual. See Guinness Certificate, at 21a, issued within the past year. Whether any reference to this case, and the failures of the judiciary, are included in the 2008 Guinness Book is an editorial decision, although I have already agreed to the wording of the record description. Other reference sources have already adopted the Guinness certificate. The exposure of the recited scam may be a welcome development.

32. The letter to the editor, at 22a, is one of several similar letters to have appeared in recent years. If the judges in Delaware refuse to *sua sponte* recuse themselves, I reserve the right to move for their disqualifications. Judge Sleet, who was not assigned to this matter before, is ineligible in view of his service on the defendant School's Board of Trustees. I also reserve the right to move for consolidation of related cases, both within this district, and in other districts, as well as in various Circuit Courts of Appeals, where the proceedings were based on developing an original record as a trial court.

33. On 7-24-07, Emily, with GMAC, called to remind me that my driver's license had expired, and that my car insurance would be cancelled if the license were not renewed.

James L. Martin

9

## ALLEGATIONS OF LAW

34. Rule 60(b) provides several provisions to warrant reopening under

the facts documented here:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (4) the judgment is void; (5) . . . it is no longer equitable that the judgment [from Judge Farnan] should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. . . . This rule does not limit the power of a court . . . to set aside a judgment for fraud upon the court. . . . [T]he procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

35. This Motion to Reopen is intended to provide a legal remedy under

which a citizen with a safe driving record for thirty-eight (38) years, after the

citizen first began to drive, and with insurance during that time, without

claims and without medical restrictions, may continue to drive on the public

roads lawfully, and may continue to possess a license for identification.

36. The unpriviledged assault on my standing, but to drive a car and to

practice law, was so successful for so many years because the presiding federal

judge in Delaware was on my principal adversary's payroll, and had personal

knowledge of and association with the key, adversary witness, and had a

vested, pecuniary interest in the outcome. DE Federal Judge Joseph J. Farnan,

Jr., appointed in 1985, presided over the cases I filed against the Delaware Law

School in the Delaware Federal District Court, like this one, Martin v. DLS, et.

al., 85-53 (JJF), 625 F. Supp. 1288, 884 F. 2d 1384, *cert. den.*, 110 S. Ct. 411 (1989),

*reh. den.*, 110 S. Ct. 766 (1990), and Martin v. DLS, et. al., 88-396-A, VA Dist,

trans. to DE Dist. at 88-298 (JJF), and others involving issues common the the

10

Law School cases. For over six years, Judge Farnan was the only trial court judge to issue decisions on outcome-determinative motions.

37. Judges in other jurisdictions, including Judge Thomas Penfield Jackson in the District Court, viewed decisions from Delaware Judge Farnan to have *res judicata* effect, so that none of the related cases ever came to trial. Some illustrations are: Martin v. DLS, et. al., 88-768 DC, *cert. den.*, 110 S. Ct. 212 (1989), *reh. den.*, 110 S. Ct. 421 (1990), and Martin v. DLS, et. al., 88-3420, E. PA, *cert. den.*, 91-8411,--US--. There are many others.

38. The Jan. 27, 1975 issue of the *Delaware Law Forum* shows that Judge Farnan was a professor at the same Law School which is a defendant here. Judge Farnan said, as noted in that article, "I was approached by Dean Emeritus Avins . . . [and asked to teach at defendant Delaware Law School.]" When James Turner, an examiner for the Office for Civil Rights, where a final administrative order was issued in my favor (which decision Judge Farnan claimed could be "ignored"), interviewed the Law School's Dean, Anthony Santoro, former Dean Santoro said, ". . . that he was relatively new to the deanship of DLS. *The former dean, Dean Avins, was involved.* [Emphasis added.] Dean Avins hired Judge Farnan to teach at the law school on an emergency basis, according to a frivolous statement from Judge Farnan.

39. Judge Farnan consistently issued Orders to protect his former employer, who was the Delaware Law School, and his colleagues, and these decisions are all void ab initio in view of the documented nexus and of Judge Farnan's lying about it. Here is one illustration of his denial of any

11

extrajudicial nexus, from liar Judge Farnan's 6-3-91 Op. in <u>Martin v. Smith</u>
<u>[Professor at Delaware Law School], et. al.</u>, No. 91-75, D. DE:

Both the United States Supreme Court and the Court of Appeals for the
Third Circuit has stated unequivocally that a recusal motion based on bias or
prejudice must point to a bias or prejudice that stems from an extrajudicial
source.

Employment at the principal adversary, in itself, is more than adequate to
warrant recusal. An interview incident to employment by a, if not the,
principal witness, when that witness' testimony would relate to matters about
which the presiding judge has personal knowledge from his direct experience
associating with and working for the same witness, in itself, is also more than
adequate to warrant recusal. Combined, these two criteria mandated the kind
of forceful measures I already adopted to result in Judge Farnan's removal, so
all of the "decisions" are void *ab initio*.

40. In a previous Motion to Reopen related, and consolidated cases, the
Third Circuit purported to rely upon <u>National Passenger RR Corp. v. Maylie</u>,
910 F. 2d 1181 (3rd Cir. 1990) to conclude that the district court lacked authority
to rule on a motion to reopen I brought in the E. Dist. of PA "because it was
untimely filed." That excuse does not arise here, because I am proceeding
under provisions in Rule 60(b) not controlled by the one-year period from the
date of the decision sought to be modified.

41. Applying the reasoning of Maylie to the case at bar yields the
opposite decision. *Maylie* was a contested case; however, in the case at bar,
the terms of a final administrative order issued against the defendants should
be carried out, and the state defendants already admitted they had no basis to

12

interfere with my driver's license. Maylie had a jury trial that he lost; the one at bar did not require a trial as to liability in view of the final, unappealed, administrative order issued in my favor and against the Delaware Law School and its cronies, and that order would have been executed but for

(a.) the interference of the employee of the Law School, Joseph Farnan, whose six-year involvement as a federal trial judge in Delaware under the color of federal law was terminated with his involuntary removal;

(b) the light-hearted and casually carefree attitude the Department of Education adopted after the issuance of the final administrative order; and

(c) the failure of the judiciary and the Attorney General's office in Pennsylvania and later, in Delaware as well.

42. Maylie raised several grounds for a new trial under F. R. Civ. P. 59 ". . . one of which was that the shop superintendent used coercive tactics to deter employees from testifying on Maylie's behalf.--" Id., at 1182. The matter at bar has nothing to do with either a new trial or with Rule 59. Maylie filed a motion for relief from final judgment under Rule 60(b) [without specifying what subsection of 60(b) comprised its basis] to get a new trial, and the motion was granted; in this case, however, I am filing a motion to reopen on the basis of evidence that arose in May 2007. The parties in the related cases lied, like their former employee on the local federal bench and his successor confederates, about what occurred after inducing me to believe just the opposite.

13

## CONCLUSION

This motion to reopen should be granted, in view of the continuing need to clarify the record, compel the defendants to restore various rights taken for many years without notice, hearing, or cause, and to pay extensive damages, attorney's fees, costs, and prejudgment interest as well.

DATED: July 24, 2007

BY: *James L. Martin* _ _ _ _ _ _ _ _ _ _
James L. Martin, attorney; 805 W. 21st St..; Wilmington, DE 19802-3818
e-mail MARTINJIML@aol.com  (302) 652-3957

14



RECEIVED
MAY 14 1992
OFFICE OF ATTORNEY GENERAL
LITIGATION SECTION

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

James L. Martin, plaintiff       : Civil Action No. 88-2300 (DHH)

      v.       : Jury Trial Demanded

Phares Wilson, et. al., defendants    :

RESPONSES OF DEFENDANTS TOBIN, PACHUTA,
AND NICKSIC TO

## PLAINTIFF'S REQUESTS FOR ADMISSIONS

I, James L. Martin, request that defendants Phares Wilson, PA State Police, James Nicksic, Douglas Tobin, Robert Spena, John Pachuta, and Commonwealth of PA, PA Dept. of Trans. (Bureau of Traffic Safety Operations) respond to the following RFA's:

1. Gwendolyn Mosely, counsel for the defendants, in a "Motion for Enlargement of Time within which to respond to Complaint," dated 5-2-88, appeared for "James Nicksic, Douglas Tobin, Robert Spena, and John Pachuta . . .."

2. In para. 2 of the same document, she corrected noted that "service by mail upon the above-named defendants was acknowledged on April 13, 1988."

3. Ms. Mosley entered an appearance for all the defendants as set forth in her initial pleadings, and leave of court has neither been requested nor granted to allow her to withdraw her appearance, and no other attorney has sought to appear on behalf of Spena and Wilson.

M: Bye.

5. The documents at Ex-1 to 3 verify what I told Ms. O'Neill during our phone conversation.

6. Ex-1, an Official Notice dated 11-16-83, directly contradicts what she told me about any restoration fee.

7. The temporary license, issued on 12-1-83, appears at Ex-2.

8. My check, showing the defendant Department's endorsement, appears at Ex-3.

9. No revocation fee is or has been outstanding.

10. In 4-81, when my driver's license was due for renewal, I got an inquiry about my medical condition from you, and I indicated that I was once improperly diagnosed to be medically disabled, but that the condition was alleged to be "in remission."

11. You requested that I go to my doctor to have a General Medical Form completed.

12. In a letter dated 4-20-81, I informed you that I did not have a doctor, that my answer to your questionnaire was "yes" because I had been diagnosed to have "schizophrenia--paranoid type," and when I was released, this condition was diagnosed to be "in remission;" that other doctors who had

diagnosed me reported that the condition, if any, was not evident; and that I had not been able to afford the price for expungement of my medical records.

13. You recalled my driving privileges with knowledge that I had no adverse driving history, that the medical condition that I was alleged to have had was th result of a bogus diagnosis, and that I could not have had my license restored even if I had consulted a doctor who certified that I was not medically disabled.

14. The General Medical Forms you sent to me are not used to evaluate those drivers whose disability is the result of a neuropsychiatric impairment; you have a different form for those alleged to be suffering from a neuropsychiatric condition, but you did not provide me with that form.

15. I carry the presumption of being a safe and able driver until you present evidence to call me competency into question, and you never did have any such evidence.

16. You did not respond to the Petition for Review that I filed in the Lancaster County Court of Common Pleas on 6-12-81 at Trust Book 47, p. 30.

17. You refused to honor the supersedeas and the stay filed in Lancaster, PA.

18. After I filed the Notice of Appeal on 6-11-81, you continued to pursue this matter as though it were not pending in any court.

3a

19. You filed no pleadings, briefs, or other documents in the litigation I had to pursue to have my license restored.

20. You had the original file removed from the Lancaster County Court of Common Pleas; therefore, the Notice of Appeal lingered for over 2 years.

21. On 9-24-81, you sent Trooper Nicksic to my home in Quarryville, PA; he left a written notice directing me to find someone who would drive me to the police station.

22. On Friday evening, 3-26-82, you sent a police officer to my home area who parked his car next to my neighbor's house to await my return and, when I did not arrive, your officer just continued to wait there until nearly mid-night.

23. Police officers and agents acting on your behalf called and communicated with members of my family, with school officials, and with my neighbors in a bad-faith effort to harass me without legitimate cause, and this prying into my personal life was not privileged.

24. At no time did you grant me the opportunity for a hearing before revoking my license.

25. I never concealed my whereabouts or withheld any evidence available to me incident to this matter.

4a

26. When I was institutionalized in 1975, you did not suspend or revoke my license.

27. I have had a good driving record ever since I was first licensed to drive in May 1969.

28. You restored my permanent license within 24 hours after I filed my brief in the PA Superior Court at 02308 PHL 83, and you were aware of the facts and laws recited in my brief for the preceding 2 1/2 years, while you were depriving me of the most basic adversarial and procedural rights an accused person is supposed to have.

29. You never did have any medical reports from a doctor or from any medical personnel about any medical impairment you alleged I had.

30. You authorized the mailing of an "Official Notice" dated 4-15-81 to me that requested me to "undergo an examination conducted by your [my] physician" after you knew, or should have known, that I had no doctor and no adverse condition that interfered with my ability to drive safely.

31. I responded to your 4-15-81 notice fully in a letter dated 4-20-81, when I explained the situation completely.

32. In an "Official Notice" dated 5-29-81, you recalled my license and further demanded that I return any current license which I had not later than 7-3-81.

5a

33. Your office in 1981 did not authorize you to revoke or suspend licenses unless you had proof of a licensed driver's incompetency to continue driving.

34. You did nothing to alleviate the effects of the unauthorized and improper revocation and suspension even after my permanent license was restored on 12-1-83.

35. You knew that an adverse history—one marked with a 2 1/2 year revocation for a "neuropsychiatric condition"—would and did comprise a substantial hardship for insurability, for licensure to drive in other states, and for admission to a licensed profession like the practice of law.

36. In an "Official Notice" dated 11-16-81, John Pachuta indicated that the revocation dated 11-16-81 was in addition to any previously issued suspension/revocation, and "credit toward serving said suspension will begin when license is received by Bureau."

37. You did know, or should have known, that you had no legally cognizable reason to revoke or to suspend my driver's license.

38. In view of the Petition for Review that was filed in the Lancaster County Court of Common Pleas, you did know that the Petition stayed all further attempts to seize my drivers license.

39. I also filed a supersedeas in addition to the Petition for Review.

40. You did not honor the procedural protections afforded by the Petition for Review, the Supersedeas, or the Stay at any time.

41. You did nothing to alleviate the effects of the revocations and suspensions even after my permanent license was restored on 12-1-83.

42. On 9-24-81, Officer Nicksic came to my home at RD 4, Box 434, Quarryville, PA, 19766, in southern Lancaster county, PA, and left a written note that directed me to find someone who would drive me to the police station.

43. On Friday evening, 3-26-82, Nicksic participated in an attempt to get physical custody over me by awaiting my return to my Quarryville home until almost mid-night.

44. The phone conversations I had with Nicksic and with the other officers like Wilson were tape recorded and are in the police records.

45. If you had been successful with getting my driver's license, you could also have succeeded with preventing my bank in DE from cashing checks, because I used my license for identification as well.

46. In March 1981, Officer Wilson visited my neighbors, like Verna Shirk and Sylvia May, and specifically asked them whether they could say where I was.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES L. MARTIN,            :
       Plaintiff         :
                       :
       v.              : No. 88-2300
                       :
PHARES WILSON, et al.,    : (Judge Huyett)
       Defendants      :

## RESPONSES OF DEFENDANTS TOBIN, PACHUTA,
## AND NICKSIC TO PLAINTIFF'S REQUESTS FOR ADMISSIONS

Defendants Tobin, Pachuta and Nicksic, by their attorneys hereby respond to plaintiff's requests for admission in the above-captioned case:

1.  ADMITTED that Senior Deputy Attorney General sought an enlargement of time on May 2, 1988 and included Robert Spena's name among the other defendants on whose behalf she requested more time.  By way of further answer, Robert Spena was not employed by the Commonwealth of Pennsylvania Department of Transportation on May 2, 1988 and Phares Wilson was deceased.  Ms. Mosley had not acknowledged service of the complaint on behalf of either of those individuals.  No acknowledgement of service form has ever been completed and returned to plaintiff by Ms. Mosley for these individuals.

2.  ADMITTED that the motion for enlargement served and filed on May 2, 1988 stated that service by mail was acknowledged by defendants Pennsylvania State Police, James Nicksic, Douglas Tobin, Robert Spena, John Pachuta and the Pennsylvania Department

6.    Answering defendants are not able to admit or deny
the truthfulness of the answers in this paragraph because they do
not know whether they represent an accurate transcription of the
conversation between plaintiff and Ms. O'Neill.

7.    ADMITTED that the document appended as Exhibit 2
purports to be a temporary license issued on 12-1-83.

8.    ADMITTED that the document appended as Exhibit 3
purports to be a check written by plaintiff to the Commonwealth of
Pennsylvania.

9.    ADMITTED.

10.    ADMITTED.  By way of further answer, the response
given by plaintiff had no legal effect because the form must be
completed by a licensed physician.

11.    ADMITTED.

12.    ADMITTED that plaintiff sent a letter dated May 20,
1981 which purports to explain his response given on the General
Medical Form.  The May 20, 1981 letter speaks for itself.

13.    ADMITTED that plaintiff's driving privileges were
recalled even though there was no known adverse driving history.
By way of further answer, plaintiff's driving privileges were
recalled because he responded that he had been diagnosed as
suffering from a disability that accompanied impaired his ability
to safely operate his car.  The remaining averments are denied.  It
is  specifically  DENIED  that  anyone  in  the  Department  of
Transportation or in the Pennsylvania State Police knew that

3

9a

21.   ADMITTED that Trooper Nicksic went to plaintiff's residence in Quarryville, PA in 1981 and left a written notice directing him to find someone to drive him to Troop J.  ADMITTED further that Trooper Nicksic acted pursuant to a lift order issued by the authority of the Department of Transportation.

22.   ADMITTED that Trooper Nicksic returned to plaintiff's home after 1981 and parked in his car to await plaintiff's return; however, plaintiff did not return to his home at any time that the Trooper awaited his return.

23.   DENIED.

24.   ADMITTED.

25.   Answering defendants have no way of knowing whether plaintiff concealed his whereabouts or withheld any evidence available to him.  Answering defendants do not know what evidence was available to him.

26.   ADMITTED that no one employee by the Department of Transportation suspended or evoked plaintiff's driver's license in 1975.

27.   ADMITTED that the Department has received no information other than plaintiff's response to the renewal application and statements on the General Medical Forms and letters regarding his driving ability.

28.   ADMITTED that the Department of Transportation notified plaintiff on November 16, 1983 that his operating

5

/0a

privilege was being restored effective that day pending the outcome of his appeal. Each and every remaining averment in this paragraph is DENIED.

29. ADMITTED that the Department of Transportation has no medical reports from a doctor or any other medical personnel. DENIED that answering defendants alleged that plaintiff had a medical impairment. To the contrary, information about plaintiff's medical impairment came from him.

30. ADMITTED that the Department sent plaintiff a notice dated April 15, 1982 directing him to undergo an examination conducted by his physician. DENIED that the Department or its employees knew or should have known that plaintiff had no doctor or that he was not suffering from any condition that interfered with his ability to drive safely. On the contrary, notwithstanding plaintiff's written protestations, his initial affirmative response on his application for renewal that he suffered from a condition which interfered with his safe operation of a car provided ample basis for the requirement that he undergo a physical examination by a physician.

31. ADMITTED that plaintiff responded to the Department's April 15, 1981 notice with a letter. DENIED that plaintiff "explained the situation completely" in his letter dated April 20, 1991.

32. ADMITTED that an official notice from the Department of Transportation was sent to plaintiff recalling his license and

6

//a

requested him to return the license by a specified date.

33.   DENIED.

34.   ADMITTED that the Department and its employer took no action after restoring plaintiff's driver's license.   DENIED that there was any reason for doing so.   DENIED that plaintiff suffered any ill effects from the recall of his license in that he did not at any time give up his license.   DENIED that the Department or its employees took action concerning plaintiff that was unauthorized or improper.

35.   DENIED.

36.   ADMITTED that the language referred to is the standard language found in a letter notifying of suspension.

37.   DENIED.

38.   DENIED.

39.   Answering defendants do not know the time period plaintiff is referring to and so are not able to admit or deny the averments in this paragraph.

40.   ADMITTED that the Department did not refrain from its efforts to obtain possession of plaintiff's driver's license.

41.   ADMITTED that the Department and its employees took no action after restoring plaintiff's driver's license.   DENIED that there was any reason for doing so.   DENIED that plaintiff suffered any ill effects from the recall of his license.

42.   ADMITTED that Trooper Nicksic left a note directing plaintiff to surrender his drier's license to the State Police and

7

12a

the notes at issue and have no personal knowledge of John Landis.

Respectfully submitted,

ERNEST D. PREATE, JR.
Attorney General

BY:     _Gwendolyn T. Mosley_
GWENDOLYN T. MOSLEY
Senior Deputy Attorney General

JOHN G. KNORR, III
Chief Deputy Attorney General
Chief, Litigation Section

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

DATE:   July 23, 1992

9

13a

*Pennsylvania Department of State Bureau of Professional and Occupational Affairs*

*License Verification*

## Person Information
**Name:** JAMES L MARTIN **Address(city,state zipcode):** WILMINGTON DE 19802

## Employer Information
**Name   Address(city, state zipcode):**   HERSHEY PRE OWNED INC
QUARRYVILLE PA 17566

## License Information
**Type:** Vehicle Salesperson   **Secondary Type:** N/A **Number:** MV147221L
**Profession:**   Vehicle Board **Status:**   Active **Obtained By:** Application
**Issue Date:**  7/8/1998 **Expires:** 11/30/2007 **Last Renewed:** 5/6/2005

**Standing:**  This license is in good standing.
**Disciplinary action history:**   No disciplinary actions were found for this license.



Commonwealth of Pennsylvania Department of State
Bureau of Professional and Occupational Affairs
Vehicle Salesperson

License Number
MV147221L

Expiration Date
05/31/2007

Issued To:
JAMES L MARTIN
THE CAR CORRAL
925 ROBERT FULTON HIGHWAY
QUARRYVILLE PA 17566

License Status
Active

*14a*

23 July 1996

Dear ATTY. MARTIN:

I received your letter of
July 17, 1996

You ask, I surmise, if I have any personal
knowledge of your case. The answer, sir, is that I do not.

Your case would be the kind that the Pa.
OFFICE OF ATTORNEY GENERAL would routinely be
responsible for handling in Court when a state
agency and its officials get sued. Since those
types of cases are so numerous, perhaps in the
hundreds or even thousands, that the "EXECUTIVE
OFFICE" of ATTY. General does not ordinarily get
involved in their litigation. These types of cases
are assigned by the head of the "CIVIL DIVISION"

Ex 15a

John Knorr, to one of the staff attorneys. In this case, the matter appears to have been assigned to a very capable attorney, Gwen Mosley, as indicated on the exhibit attached to your letter.

Finally, much of the facts you allege occurred in years preceding my tenure as Attorney General. As I said, I know nothing about your case.

Sincerely

Ernest D Preak Jr

cc - Lou Rovelli, Chief Dep. Atty. General

Ernest Preake Jr
# 08269-067
Dorm 207, Room 218
P.O. Box 1000
Duluth, MN.
      55814

Atty James Martin

16a

# The Philadelphia Inquirer

ROBERT J. HALL, *Publisher and Chairman*
MAXWELL E.P. KING, *Editor and Executive Vice President*
GENE FOREMAN, *Deputy Editor and Vice President*

JAMES M. NAUGHTON, *Executive Editor*
STEVEN M. LOVELADY, *Managing Editor*
RONALD PATEL, *Associate Managing Editor*
SANDRA L. WOOD, *Associate Managing Editor*

DAVID R. BOLDT, *Editor of the Editorial Page*
DONALD KIMELMAN, *Deputy Editorial Page Editor*
ACEL MOORE, *Associate Editor*

C8 b                                          Sunday, December 13, 1992



PENN$YLVANIA $UPREME COURT

Philadelphia Inquirer / TONY AUTH

Ex. 17a



DRIVEN FROM THE TEMPLE

The Philadelphia Inquirer / TONY

ROBERT J. HALL, *Publisher and Chairman*
WELL E.P. KING, *Editor and Executive Vice President*
GENE FOREMAN, *Deputy Editor and Vice President*

JAMES M. NAUGHTON, *Executive Editor*
STEVEN M. LOVELADY, *Managing Editor*
RONALD PATEL, *Associate Managing Editor*
SANDRA L. WOOD, *Associate Managing Editor*

DAVID R. BOLDT, *Editor of the Editorial Page*
JANE R. EISNER, *Deputy Editorial Page Editor*
ACEL MOORE, *Associate Editor*

Sunday, April 24, 1994

## ORIALS

# Nixon's will

*ur ideals and proved*
*ger than any man*

hiring blacks in the construction trades. He was friendly to the environment. Cities pine for his "revenue-sharing." Democrats wish they could pass today the provisions floated by Richard Nixon's health reformers. And trade with China opened up under his watch.

But policies are one thing. Personality is another. And it would be, in the run up to his second term, that Mr. Nixon's darker side — his resentments, his insecurities — found expression in White House "plumbers," in-house spies, dirty tricksters, bagmen, wiretappers and, lastly, the third-rate burglars who bumbled the break-in at the Democratic National Committee's offices. Only days after that break-in, Mr. Nixon secretly taped himself orchestrating the illegal coverup. He styled himself as the law-and-order president, and yet ultimately, his fate was sealed by the fact that he cared not for the law.

It was in that episode, as Barry Goldwater would later reflect, that he came as close to destroying Amer-

## LETTERS

# Dad Vail controversy continues to fill the mailba

Call me a cynic, but after reading between the lines on the recent skirmish in City Council over the Dad Vail Regatta, I smell a rat — maybe a few. Is racism really the issue here? It doesn't take a rocket scientist to see the potential commercial value of that beautiful stretch of real estate along the Schuylkill.

Are certain special-interest groups using Messrs. Gibson and Street as pawns in their

**WHERE TO WRITE:**

Letters
Philadelphia Inquirer
P.O. Box 8263
Philadelphia, Pa. 19101
Fax: 215-854-4483
E-mail: EditPage@AOL.com

The Inquirer welcomes letters from its readers. For verification purposes, include home address

## Different musical styles

"The news that Riccardo Muti has chosen not to return to conduct the Philadelphia Orchestra in the immediate future has disappointed many people. Unfortunately, that appointment has led some people to diminish, and in some cases distort, the substantial contribution that Maestro Muti made to the City of Philadelphia during

STATEMENT OF MICHAEL J. DALTO

I, , depose and say that the following statements are true and correct to the best of my personal knowledge, information, and belief, and make them under penalties for perjury in accord with 28 USC Sec. 1746, this 24th day of July 2007:

1. I am a long-standing resident of Delaware and currently live at 504 Woodside Avenue; Wilmington, Delaware 19809.

2. I was the Democratic candidate for State Auditor of Delaware in the November 2006 general election.

3. I have known James Martin for more than twenty-five (25) years.

4. In view of his experience as an accountant and as an attorney, I asked him to be my campaign manager beginning in August 2006, and he did so.

5. The agreement was that James Martin would help me campaign, and I would help him with getting the longest running court case in world history resolved, which he had been leading since January 1972, and which poses various political challenges in addition to the legal issues presented.

6. Attorney Martin went with me to various political functions, including speeches, receptions, fundraisers, announcements, and other campaign activities in all three counties in Delaware. We worked until return day in Georgetown, Delaware, and thereafter in November 2006, following the election.

7. In addition, as the campaign operations manager, he wrote several editorials that were published in the *Wilmington News Journal*, and

*19a*

discussed daily political strategy with other Democratic leaders in the Senate, including Majority Leader Harris McDowell, who is also the senator for the district where Mr. Martin's Delaware home office is located.

8. I learned various accounting and legal concepts that would be helpful if I were elected State Auditor from Mr. Martin, which I incorporated into my campaign presentations and speeches. I got a majority of the votes in New Castle County, where we both live, and where most of the campaigning took place. Due to limited time and funding, we lost support in south Delaware, and lost the general election by a margin of 18,117 votes, from a total of 245,067 votes cast statewide. In the city of Wilmington, voters favored me over the incumbent 11,591 to 4,482, and in New Castle County, they favored me 69,686 to 67,279.

9. If I had won the election, my intent was to have Mr. Martin work as the Chief of Staff in charge of all business and operations for the Office of State Auditor, fo a minimum, four-year term.

MICHAEL J. DALTO



# CERTIFICATE

**The longest running civil court
case has been led by
James Martin
of Wilmington, Delaware, USA
since 14 December 1972,
when the issue in the
Martin v. Sample case was filed**



**GUINNESS WORLD RECORDS LTD**

© GUINNESS WORLD RECORDS LTD 2005. THIS CERTIFICATE DOES NOT NECESSARILY DENOTE AN ENTRY INTO ANY PRODUCTS DISTRIBUTED OR OWNED BY GUINNESS WORLD RECORDS LTD AND MUST NOT BE REPRODUCED WITHOUT PRIOR WRITTEN PERMISSION OF GUINNESS WORLD RECORDS LTD.

www.guinnessworldrecords.com

21a

**A8** • • • Saturday, March 17, 2007
www.delawareonline.com

**The News Journal**
A Gannett newspaper
**W. Curtis Riddle**
President and Publisher

The News Journal, Wilmington, Del.

**David F. Ledford**
Executive Editor

**John Sweeney**
Editorial Page Editor

**Richard Tapscott, Pankaj Paul**
Managing Editors

# Opinion

## OUR READERS' VIEWS

### Judges plagued by other conflicts at the law school

State and federal Delaware judges are paid, or otherwise rewarded, for teaching and for performing various functions at the Widener University School of Law.

When litigation involving their part-time employer came before them, these same judges have been known to persist with presiding over the litigation, and to issue rulings that contravened prior, final administrative judgments on the same issues.

This level of judicial misconduct is much more notorious than Justices Steele's and Ridgely's appearance of impropriety from acceptance of memberships in the Wild Quail Country Club.

Focus on a remedy for actual misconduct before looking about the mere appearance of it.

**Jim Martin**
Wilmington

22a

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

James L. Martin, plaintiff                      : Civil Action No. 85-00053-JJF

      v.                                              : Jury Trial Demanded

Delaware Law School of Widener University, Inc., Commonwealth of
Pennsylvania Department of Transportation, Bureau of Traffic Safety
Operations, et. al., defendants

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of Plaintiff's

Memorandum of Law in Support of Motion to Reopen upon opposing

counsel of record for the defendants at the following addresses:

Somers Price, Jr., Esq.; POTTER, ANDERSON & CORROON; P. O. Box
951; Wilmington, DE 19899;

A. Taylor Williams, Esq.; Adm. Office of the PA Courts; Suite 1414;
1515 Market St.; Phila., PA 19102;

Gwendolyn T. Mosley, DAG; Office of the AG; Litigation Section; 15th
Floor; Strawberry Square; Harrisburg, PA 17120;

Robert B. Young, Esq.; YOUNG & MCNELIS; P. O. Box 1191; 300 S. State
St.; Dover, DE 19903;

Stuart B. Young, Esq.; 1705 N. Bancroft Pky; Wilmington, DE 19806; and
on

F. Alton Tybout, Esq.; TYBOUT, REDFEARN & PELL; 750 S. Madison
St., Suite 400; Wilmington, DE 19899-2092.

by first-class, postage prepaid mail this 24th day of July 2007.

BY: _James L. Martin_____
James L. Martin, attorney; 805 W. 21st St.; Wilmington, DE 19802-3818
(902) 652-3957      email MARTINJIML@aol.com